UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael Eason,

Civ. File No. 00-311 (PAM/SRN)

Plaintiff,

v.

**MEMORANDUM AND ORDER**

The Anoka-Hennepin East Metro Narcotics & Violent Crimes Task Force,

Defendant.

---

Plaintiff Michael Eason Plaintiff alleges that police officers working under the direction of Defendant Anoka-Hennepin East Metro Narcotics & Violent Crimes Task Force (the "Task Force")[1] used unreasonable and excessive force by handcuffing Eason behind his back despite Eason's requests to be handcuffed in front of his body. Eason asserts that the Task Force officers' conduct aggravated a preexisting medical condition. Eason filed this action pursuant to 42 U.S.C. § 1982, claiming violations of his constitutional rights under the Fourth, Fourteenth, and Eighth Amendments. Eason has also filed a state tort claim for negligence. For the following reasons, the Court grants in part and denies in part the Task

---

[1] Eason originally filed this action against the individual officers involved in the incident, the Task Force, and a number of municipal entities. The parties have stipulated that the Task Force will substitute itself for the remaining Defendants. May 16, 2002, Stipulation and Order at 3. According to the agreement of the parties, the Task Force is subject to liability for acts of the individual officers who may have violated Eason's constitutional or state-law rights. Concomitantly, the Task Force may avail itself of any defenses available to the individual officers.

FILED JUN 0 6 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Force's Motion for summary judgment.[2]

**BACKGROUND**

On February 11, 1998, the Task Force and members of the federal Drug Enforcement Agency made plans to execute an arrest warrant for Eason and to execute a search warrant at Eason's home because of his alleged involvement with drug trafficking for the Hell's Angels. The Task Force believed that Eason was a source for the distribution of methamphetamine.

Although any arrest for drug trafficking necessarily involves some risk, the Task Force suspected that Eason might be especially dangerous. Specifically, it points out that Eason is a former police officer whose employment was terminated because of allegations of excessive force (Blasingame Dep. at 38); he was an accomplished boxer in the military (Olson Dep. at 37); he is known to collect firearms and was thought to supply the Hell's Angles with firearms (Blasingame Dep. at 39); and he was believed to trade drugs for firearms. (Id.) In any event, the Task Force officers divided into two groups: one to conduct the search of Eason's home, and one to conduct surveillance of Eason.

At approximately 1:38 a.m. on February 11, Eason left Minneapolis Custom Cycle, got into his vehicle, and headed west on Interstate 94. The officers observing Eason had

---

[2] In the May 16, 2002, Stipulation and Order, the parties also agreed that "[i]f the Court determines [that] the individual officers would be entitled to immunity, this matter shall be dismissed with prejudice." Id. Based on this language, the Court dismisses Eason's claims against the remaining Defendants except the individual officers arresting Eason.

planned to stop him if he left Minneapolis Custom Cycle. The officers determined that they should get the assistance of a marked police vehicle to effectuate the stop. Accordingly, the officers requested help from Maple Grove and Hennepin County. Eventually, however, a Minnesota State Trooper responded to the request and pulled Eason over in a vacant church parking lot.

Eason got out of his car voluntarily and put his hands in the air to surrender to the officers. Eason alleges that he told the officers that he had recently had heart surgery and that he was concerned about having his arms pulled behind him. The officers, however, grabbed Eason, slammed him against his vehicle, and pulled Eason's right arm behind him. At this point, Eason alleges that he again expressed concern about his chest saying that "my chest is wired up." (Eason Dep. at 38.) Eason claims that one of the officers responded, "I don't give a f---," and then smashed Eason's head against his vehicle. (Id.) The officers took Eason's other arm and pulled it behind his back. Again, Eason claims to have said, "I'm wired up . . . don't pull my arms back." (Id.) The officers had some difficulty getting Eason's arms far enough behind his back to cuff him. (See id. at 40; Darby Dep. at 20; Teale Dep. at 43-44.) It should be noted, however, that Eason was not resisting arrest or the officers' attempts to pull his arms behind him. (See Darby Dep. at 20; Banks Dep. at 22.) Indeed, at least one of the officers involved in the arrest described Eason as "very cooperative" and the arrest as "routine." (Blasingame Dep. at 33-34.) The officers finally did get a set of handcuffs on Eason.

At approximately 1:58 p.m., Eason was placed in a squad car. At that time, he asked the officers to move the handcuffs to the front of his body. (Id. at 42-43.) The record indicates that he made this request several times. The requests were refused. Eventually, the officers double-locked the handcuffs to prevent them from getting tighter. (Id. at 44.) Eason arrived at the Brooklyn Park Police Department at about 2:16 p.m.

During the booking process, Eason's handcuffs were removed and he completed a medical screening form which included the following questions: (1) have you been injured within the last 24 hours; (2) have you recently seen a doctor; and (3) do you need medical attention now. (Reuvers Aff. Ex. A.) Eason concedes that on the form he noted that he had not been injured within the last 24 hours and that he did not need medical attention. (Id.) He did, however, state that he had seen a doctor two days earlier for chest pain and that he was on several medications for pain and blood thinning. (Id.) Nevertheless, Eason did not request medical attention while in jail.

On February 17, 1998, Eason went to a regularly scheduled doctor's appointment and complained of a persistent cough and chest pain. He was ultimately diagnosed with a sternal dehiscence. In other words, the wires holding his sternum together had pulled part. Eason's doctor states that it would be unusual to see all of the wires pulled through, as they were, with routine activity. (Peterson Aff. Ex. A (Feb. 26, 2001 letter from Dr. Sara Shumay to Paul Peterson).) She opines that, assuming Eason's recitation of the facts is true, the cause of the sternal injury was likely the events of February 11, 1998. (Id. (March 19, 2001 letter

from Dr. Sara Shumay to Paul Peterson).) In any event, on April 1, 1998, Eason underwent a sternal rewiring. Eason has done well after this rewiring, and his doctor is of the opinion that his sternum is now reasonably intact and should not present any further problem for him. (Id.)

**DISCUSSION**

**A. Summary Judgment Standard**

Rule 56(c) provides that a motion for summary judgment shall be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996)

If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953,

957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co., 475 U.S. at 586.

**B. Constitutional Claims**

Eason claims that the Task Force violated his constitutional rights. His claims are predicated on 42 U.S.C. § 1983, which provides in pertinent part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. To make out a prima facie case under § 1983, a plaintiff must show that: (1) the alleged wrongful conduct was committed by a person acting under color of law; and (2) the conduct deprived the plaintiff of some right, privilege, or immunity secured by the Constitution or laws of the United States. Collins v. City of Harker Heights, Tex., 503 U.S. 115, 120 (1992).

It is undisputed that the Task Force was acting under color of state law when officers operating under its auspices arrested Eason. To satisfy the second prong of his prima facie case, Eason alleges that the arresting officers used excessive force in violation of the Fourth Amendment, Fourteenth Amendment, and Eight Amendment.

In order to succeed on his various constitutional claims, Eason must show that the

arresting officers are not protected by qualified immunity. Generally, police officers who are performing discretionary functions are shielded from liability for civil damages so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Smithson v. Aldrich, 235 F.3d 1058, 1061 (8th Cir. 2000) (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987) (noting that government officials are protected if they reasonably believed that their conduct was lawful "in light of clearly established law and the information possessed" by them at the time of the incident)). Because qualified immunity shields officers from suit, the question of whether an officer is protected by qualified immunity must be resolved at the earliest possible stage in the litigation. Saucier v. Katz, 533 U.S. 194, 200-01 (2001).

Determining whether an officer is entitled to the protection of qualified immunity is a two-step process. See Ware v. Morrison, 276 F.3d 385, 387 (8th Cir. 2002); Washington v. Normandy Fire Prot. Dist., 272 F.3d 522, 526 (8th Cir. 2001). Initially, a court must decide whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [officer's] conduct violated a constitutional right." Saucier, 533 U.S. at 201. If a constitutional violation can be demonstrated by the facts alleged, the court must undertake the second step of the process and decide if the constitutional right was clearly established. Id. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that

right." Id. at 202 (quoting Anderson, 483 U.S. at 640). If the right was not clearly established, then the officer's actions are protected by qualified immunity.

**1. Fourth Amendment violation**

The Supreme Court has held that "all claims that law enforcement officers have used excessive force–deadly or not–in the course of an arrest, investigatory stop or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989). There is no question that Eason was seized for the purposes of the Fourth Amendment. The key question in this case is whether the means used to effectuate that seizure were reasonable. If the means used were unreasonable, then the court must determine whether, under the specific circumstances, a reasonable officer should have known that his or her conduct was violating Eason's Fourth Amendment rights.

"[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out." Tennessee v. Garner, 471 U.S. 1, 7-8 (1985). In particular, courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In short, determining the constitutionality of a particular seizure requires courts to balance the nature and quality of the intrusion against the countervailing importance of the governmental interests allegedly justifying the intrusion. Id. at 396 (quoting Garner, 471 U.S. at 8

(citations omitted)); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994) (stating that "[t]he force which was applied must be balanced against the need for that force").

Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, the unique facts of a given seizure are of foremost importance. See Garner, 471 U.S. at 8-9 (noting that the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure"). As the Supreme Court has emphasized, however, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396 (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . [and] allowance [must be made] for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving." Id. at 396-97 (citations omitted).

In the context of this case, the primary issue is whether the officers were justified in handcuffing Eason behind his back despite Eason's warnings that he had recently undergone surgery and that his chest was "wired up," and despite the fact that the officers had difficulty moving Eason's arms behind his back and together for cuffing. As the Task Force correctly notes, "not every push or shove violates the Fourth Amendment." Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998) (citation omitted). Additionally, "a standard procedure such as

handcuffing . . . rarely constitute[s] excessive force where the officers were justified, as here, in effecting the underlying arrest." Brown v. Gilmore, 278 F.3d 362, 369 (4th Cir. 2002). Relying on these aphorisms and a handful of cases that are ostensibly factually analogous to the situation presented here, however, the Task Force goes too far by suggesting that handcuffing a suspect behind his or her back always comports with the constitutional limitations on the use of force.

Although it is evident that handcuffing is not per se unconstitutional, see, e.g., Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990); Rodriguez v. Farrell, 280 F.3d 1341, 1352 (11th Cir. 2002), the cases that the Task Force cites to support the actions of its officers merely reify the reasonableness calculus employed by courts when a plaintiff alleges that the police have used excessive force. For instance, although the court in Smith v. City of Chicago, 242 F.3d 737 (7th Cir. 2001) determined that a plaintiff who had violated a traffic law and who was pulled from a car, pushed against the car, and handcuffed behind his back could not survive summary judgment on his excessive force claim, "a higher degree of force to protect the community" was justified under the circumstances because the plaintiff appeared to be fleeing from the arresting officers. Id. at 744.

Likewise, in Jackson v. City of Bremerton, 268 F.3d 646 (9th Cir. 2001), the court found that an officer who ignored a plaintiff's request to be allowed to go to the ground herself due to preexisting back and shoulder injuries did not use excessive force because the officers in that case were substantially outnumbered and the plaintiff ignored the officers'

order to disperse. Id. at 653. Accordingly, the Court found that the plaintiff's "active interference posed an immediate threat to the officers' personal safety and ability to control the group" and that the force applied was therefore reasonable and necessary. Id.

As these cases imply, and courts in other cases have explicitly held, the particular application of handcuffs, like any other use of force by police officers effectuating a seizure for purposes of the Fourth Amendment, may constitute an excessive use of force in some circumstances. See, e.g., Neague v. Cynkar, 258 F.3d 504, 507 (6th Cir. 2001) (stating that a viable excessive force claim can be premised on handcuffing) (citations omitted). The instant case hinges on whether arresting officers are required to take an arrestee's preexisting injuries into account when assessing the level of force necessitated in a given situation. The Court is convinced that they are so required.

Indeed, "there appears to be general agreement that officers must take note of the suspect's complaints and make some effort to accommodate the claimed conditions or injuries, provided the circumstances permit such an accommodation." Caron v. Hester, No. Civ. 00-394-M, 2001 WL 1568761, at * 5 (D.N.H. Nov. 13, 2001). The court in Walton v. City of Southfield, 995 F.2d 1331, 1342 (6th Cir. 1993), for example, held that "[a]n excessive force claim could be premised on [an officer's] handcuffing [of plaintiff] if he knew that [the plaintiff] had an injured arm and if he believed that [the plaintiff] posed no threat to him." Favorably citing this case, the Eighth Circuit has held that there was a genuine issue of material fact as to whether an officer used excessive force under the

circumstances when he forcibly restrained a plaintiff who was "recovering from surgery on his left shoulder and was wearing a sling on his left arm." Guite, 147 F.3d at 750.

Courts, however, do not necessarily agree whether a plaintiff's assertions that he or she has a preexisting injury are sufficient, standing alone, to require an arresting officer to take such an injury into account. Some courts, including the Eighth Circuit in Guite, appear to require that there be an objective manifestation of the injury. Compare Guite, 147 F.3d at 750 (noting that the plaintiff was wearing a sling on the allegedly injured arm), with Stocker v. City and County of San Francisco, No. 98-15581, 1999 WL 402236, at *1 (9th Cir. June 9, 1999) (reversing summary judgment where there was a dispute as to whether the plaintiff merely told the arresting officers about his preexisting injury); Rodriguez, 280 F.3d at 1353 (stating that "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates . . . a pre-existing condition the extent of which was unknown to the officer at the time) (emphasis added).[3] Requiring that there be an objective manifestation of the injury helps to ensure that police officers are not overburdened by having to take into account unsubstantiated and potentially falsified preexisting injuries while performing their duties.

---

[3] The Tenth Circuit's unpublished decisions in Morreale v. City of Cripple Creek, No. 96-1220, 1997 WL 290976, *5 (10th Cir. May 27, 1997) and Wells v. State of Oklahoma, No. 95-6429, 1996 WL 557722, *3 (10th Cir. Sept. 30, 1996), in which the court rejected excessive force claims where handcuffs were used in a typical manner on potentially fragile plaintiffs, can be distinguished on this basis. In both cases, the plaintiffs had merely asserted that they had preexisting injuries, but there were no objective manifestations of those injuries to corroborate their claims.

In this case, however, it makes no difference whether an objective manifestation of Eason's preexisting injury is required because there was such a manifestation. Viewing the evidence in the light most favorable to Eason, not only did he repeatedly inform the arresting officers of his recent heart surgery and the fact that this sternum was wired together, but the officers had difficulty moving Eason's arms behind his back and together for cuffing. Although it is possible that this difficulty was merely related to Eason's size, it is also possible that the range of motion in Eason's arms was limited because his sternum was wired together. In any event, there is a genuine issue of material fact as to whether Eason's multiple warnings about his preexisting injury combined with the physical difficulty of moving Eason's arms behind his back suffices to have put the officers on notice of Eason's fragile condition.

Because, as Eason points out, there is testimony that he immediately pulled his vehicle over and parked in a vacant lot, voluntarily got out of his vehicle and surrendered to the arresting officers, offered no resistance to arrest, and seemed to pose no imminent threat to the officers' safety, as well as testimony that a range of handcuffing options were available to the officers including handcuffing Eason in front of his body (see Darby Dep. at 18-19; Banks Dep. at 27) or using two sets of handcuffs (see Banks Dep. at 26-27), there is a genuine issue of material fact as to whether the officers could have made accommodation for Eason's preexisting injury under the circumstances of this particular arrest. Accordingly, the question of whether the officers used a reasonable amount of force when they handcuffed

Eason behind his back is not amenable to resolution on summary judgment.

The second step of the qualified immunity analysis requires the Court to determine if a reasonable officer, under the circumstances of this case, should have known that his or her conduct was proscribed by the Fourth Amendment. As the Court has already noted, the particular application of handcuffs in a given situation, like any other use of force, is governed by the Fourth Amendment's ubiquitous reasonableness calculus. Because there is a general consensus among courts that police officers must factor a suspect's alleged preexisting injury into this calculus, at least when there is an objective manifestation of that injury, and make some effort to accommodate the injury, provided the circumstances permit such an accommodation, the Court finds that the Fourth Amendment right at issue was clearly established at the time of the incident. There is a genuine issue of fact, then, regarding whether officers arresting Eason are entitled to qualified immunity on Eason's Fourth Amendment claim.

**2. Eight and Fourteenth Amendment Violations**

Although Eason alleges that the Task Force violated his Eighth and Fourteenth Amendment rights, he has not addressed these claims in his memorandum opposing summary judgment. Accordingly, the Court will not consider these claims at length. It is sufficient to note that the Eighth Amendment is inapplicable to this case because it only applies to convicted prisoners. See Hott v. Hennepin County, 260 F.3d 901, 905 (8th Cir. 2001). There is no contention, nor could there be, that Eason was a convicted prisoner at

the time that he was arrested.

Similarly, the Fourteenth Amendment, while potentially applicable, is only viable in the most egregious of circumstances. Feist v. Simonson, 36 F. Supp. 2d 1136, 1144 (D. Minn. 1999) (Montgomery, J.) (stating that to support a due process claim, "a plaintiff must show that the officer's actions in causing the injury constituted an abuse of executive power . . . clearly unjustified by any legitimate objective of law enforcement"); County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998) (quoting Daniels v. Williams, 474 U.S. 327, 332 (1986) (stating that the "Constitution . . . does not purport to supplant traditional tort law")). Viewing the evidence in the light most favorable to Eason, he has failed to adduce sufficient evidence to support his substantive due process claim.[4] Accordingly, the Court grants the Task Force's Motion for summary judgment on these claims.

**C. State Law Claim**

Eason also claims that the Task Force's officers were negligent. The Task Force asserts that the officers are protected from liability for state law negligence in this case by official immunity. In Minnesota, "a public official charged by law with duties which call for the exercise of judgment or discretion is not personally liable to an individual for damages

---

[4] Even if the Court were to consider Eason a pretrial detainee, a designation that is likely inapplicable to him, see Powell v. Gardner, 891 F.2d 1039, 1044 (2d Cir. 1989) (stating that a person becomes a pretrial detainee after the time of the first appearance before a judicial officer), Eason has failed to allege deliberate indifference to his medical condition. See Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 905 (8th Cir. 1999) (stating that a pretrial detainee must establish deliberate indifference to state a claim under the Fourteenth Amendment).

unless he is guilty of a willful or malicious wrong." Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988) (citations omitted); Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs, 552 N.W.2d 711, 716 (Minn. 1996). In other words, an official is shielded by official immunity unless he or she acts in a ministerial capacity or with malice. See Kelly v. City of Minneapolis, 598 N.W.2d 657, 664 (Minn. 1999); Janklow, 552 N.W.2d at 716; Pletan v. Gaines, 494 N.W. 2d 38, 42 (Minn. 1992). "Malice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." Kelly, 598 N.W.2d at 663 (citation omitted).

Eason concedes that the officers arresting him were acting in their discretionary capacity. He argues, however, that the same facts that defeat the Task Force's claim of qualified immunity support a denial of the Task Force's claim of official immunity. The Court agrees. Determining whether malice exists for the purposes of official immunity requires an "objective inquiry into the legal reasonableness of an official's actions." State ex rel. Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571 (Minn. 1994). In this case, the legal reasonableness of the Task Force's officers depends on whether they used a reasonable amount of force under the circumstances. As the Court has already stated, this determination is not amendable to resolution on summary judgment. Thus, the Court denies the Task Force's Motion for summary judgment on Eason's state law claim.

**CONCLUSION**

For the foregoing reasons, and upon all of the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that Defendants' Motion Summary Judgmcnt (Clerk Doc. No. 38) is **GRANTED in part and DENIED in part** as follows:

1. Counts One and Two of the Complaint are **DISMISSED**;
2. Counts Three and Four of the Complaint insofar as they allege violations of Eason's rights by Defendants other than the individual officers arresting Eason are **DISMISSED**; and
3. Eason may continue to trial on Counts Three and Four of the Complaint insofar as they allege violations of Eason's rights by the individual officers arresting Eason.

Dated: June 6, 2002

Paul A. Magnuson
United States District Court Judge

## *Featured Speakers Include:*

**District of Minnesota**

**Judge David S. Doty**

**Judge Donovan W. Frank**

**Judge Paul A. Magnuson**

**Judge Ann D. Montgomery**

**Judge John R. Tunheim**

**Chief Magistrate Judge Jonathan Lebedoff**

**Magistrate Judge Arthur J. Boylan**

**United States Bankruptcy Court**
**District of Minnesota**

**Judge Robert J. Kressel**

**Application Pending for 7.5 CLE Credits including 2 Ethics and 1 Bias Credit**

**The Minnesota Chapter of the Federal Bar Association**
c/o Kelly & Berens, P.A.
80 S. 8th Street, Suite 3720
Minneapolis, MN 55402

NON-PROFIT
ORGANIZATION
U.S. POSTAGE
PAID
Minneapolis, MN
Permit No. 2657

**MINNESOTA CHAPTER OF THE FEDERAL BAR ASSOCIATION**

**In connection with**
**The Federal Judiciary**

# *28th Annual Federal Court Practice Seminar*

**June 19, 2002**
**8:00 am—5:15 pm**

**Minneapolis Convention Center**
**1301 Second Avenue South**
**Room 208**
**Minneapolis, MN 55402**
**(612) 335-6000**

## Morning Session:

| | |
|---|---|
| 7:30-8:00 | **Registration** |
| 8:00-8:15 | **Opening Remarks and Welcome,** ***Judge Ann D. Montgomery*** |
| 8:15-9:00 | **Securities Law Issues in the Wake of Enron,** ***Timothy J. Warren (SEC Midwest Regional Office), Professor Niels Schaumann (William Mitchell College of Law), Karl L. Cambronne (Chestnut & Cambronne)*** |
| 9:00-9:45 | **Current Issues in Employment Law,** ***Judge Paul A. Magnuson, Linda L. Holstein (Parsinen Kaplan Rosberg & Gottlieb PA), John R. McDonald (Meagher & Geer, PLLP), Daniel Oberdorfer (Leonard, Street and Deinard)*** |
| 9:45-10:00 | **Morning Break** |
| 10:00-10:45 | **Current Initiatives in the U.S. Attorneys' Office,** ***Tom Heffelfinger (U.S. Attorneys Office)*** |
| 10:45-11:45 | **Discovery Disputes: Professionalism in the Practice of Law?,** ***Judge David S. Doty, Chief Magistrate Judge Jonathan Lebedoff, Magistrate Judge Arthur J. Boylan,*** |
| 11:45-12:45 | **Lunch (Room 211)** |

11:45-12:45 Lunch (Room 211)

## Afternoon Session:

| | |
|---|---|
| 12:45-1:30 | **The Clerk's Office Can Be Your New Best Friend,** ***Celeste Shahidi, Lou Jean Gleason, Mary Lenner, Gertie Simon, Andy Seldon*** |
| 1:30-2:15 | **How to Effectively Teach and Persuade in Patent or Intellectual Property Cases: Why, When and How,** ***Judge Donovan W. Frank, Becky R. Thorson (Robins, Kaplan, Miller & Ciresi), Stephen J. Davidson (Leonard, Street and Deinard)*** |
| 2:15-3:15 | **Issues in the Wake of 9/11: Racial Profiling --** ***Daniel M. Scott (U.S. Federal Public Defenders' Office)*****; Response by the Department of Justice --** ***Tony Brown (U.S. Attorneys Office)*** |
| 3:15:3:30 | **Afternoon Break** |
| 3:30-4:15 | **Update on Technology Tools for Litigating in Federal Court,** ***Judge John R. Tunheim, Judge Robert J. Kressel, Eric J. Magnuson (Rider, Bennett, Egan & Arundel)*** |
| 4:15-5:15 | **Ethics in "Real Life" Practice Situations,** ***Martin A. Cole (Lawyers Professional Responsibility Office)*** |

## *Seminar Registration*

☐ Member $195.00

☐ Non-Member $225.00

Name ______________________

Firm/Employer ______________________

Address ______________________

______________________

______________________

Phone ______________________

E-Mail ______________________

**Complete registration form and send with check payable to:**

**Minnesota Chapter, FBA**
**c/o Nancy Gustafson**
**Kelly & Berens, P.A.**
**Suite 3720 IDS Center**
**80 South Eighth Street**
**Minneapolis, Minnesota 55402**

**Not a Member? Join the FBA**

*To apply on-line or to download application form go to http://www.fedbar.org and click on "Join the FBA."*

Questions call: Barbara P. Berens, Vice President, Planning, Minnesota Chapter FBA
(612)-349-6171

**Annual Seminar Planning Committee:**

Kristine M. Boylan, Meagher & Geer, P.L.L.P.

Catherine A. McEnroe, Leonard, Street and Deinard

Celeste M. Shahidi, U.S. Courthouse Minneapolis Building

Susan Nolting, U.S. Department of Justice

Maureen Watz Gornik, Warren E. Burger Federal Building